UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,
                    Plaintiff,

v.                                         Criminal File No.  22-CR-180 (JNE/TNL)

ANTHONY LEE HITCHCOCK,
                    Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ANTHONY LEE HITCHCOCK'S MOTION TO SUPPRESS SEARCH AND SEIZURE

Defendant Anthony Lee Hitchcock submits this Memorandum of Law in support of his Motion to Suppress Search and Seizure (ECF 19).  Defendant argues that the police officers who effectuated his arrest on May 4, 2022 violated his constitutional rights when they committed an illegal search and seizure of his person.  The search of defendant's person on May 4, 2022 was illegal because the arresting officers lacked reasonable suspicion to stop-and-frisk his person.  The police officers also lacked probable cause to detain, seize, and arrest him.  As a result of the illegal seizure, any physical evidence allegedly recovered from Mr. Hitchcock on May 4, 2022 should be suppressed.

### PROCEDURAL HISTORY

Mr. Hitchcock was arrested at approximately 11:55 a.m., on May 4, 2022, in Minneapolis, Minnesota.  The case was originally charged out in state district court and later transferred to federal jurisdiction by the U.S. Attorney's Office for the District of Minnesota.

The Indictment (ECF 1) was filed in U.S. District Court - District of Minnesota on August 10, 2022, and an arrest warrant for Mr. Hitchcock was issued.  Mr. Hitchcock was arrested on the federal warrant on August 19, 2022.  He was later arraigned on the charges on August 22, 2022.  The Indictment (ECF 1) charges Mr. Hitchcock with one count of Felon in Possession of a Firearm.

On September 19, 2022, the defense filed Defendant Anthony Lee Hitchcock's Motion to Suppress Searches and Seizures (ECF 19).  The evidence sought to be suppressed is a firearm allegedly recovered on May 4, 2022 from Mr. Hitchcock's person, which relates to Count 1 of the Indictment (ECF 1), as well as some marijuana. Testimony from Minneapolis Police Sergeant Andrew Schroeder for the Government and Private Investigator William O'Keefe for the defense was taken in this matter in a pretrial hearing on October 27, 2022.

## STATEMENT OF FACTS

On May 4, 2022, Minneapolis Police Sergeant Andrew Schroeder was working a surveillance capacity in the area of Lyndale Avenue North and Broadway Avenue West in Minneapolis, Minnesota, in an area of the city commonly known as North Minneapolis. *See* Transcript of the October 27, 2022 Motions Hearing (ECF 51) (hereinafter "Motions Hearing Transcript"), p. 22, lines 24 - 25, and p. 23, lines 1 - 10.  Also *see* Government Exhibit 4 from the October 27, 2022 Motions Hearing.  Sergeant Schroeder was conducting his surveillance from the second floor of a building that has, on its first floor,

2

a Walgreens drug store and is located on the southeast corner of the intersection. Motions Hearing Transcript, p. 41, lines 10 - 16; *see also* Government Exhibit 4 and defense Exhibit 3 from the October 27, 2022 Motions Hearing.  At that time and place, Officer Schroeder was surveilling the Winner's Gas Station and the Merwin Liquors parking lot.  Motions Hearing Transcript, p. 24, lines 23 -25.  The Winner's Gas Station is located across Broadway from the building used for the sergeant's surveillance.  Merwin Liquors is set back from Broadway approximately a half a block from the northwest corner of Broadway and Lyndale.  *See* Government Exhibit 4 from the October 27, 2022 Motions Hearing.  While conducting his surveillance, Sergeant Schroeder was using Bushnell binoculars 10 x 42.  Motions Hearing Transcript, p. 25, lines 9 - 16.

At approximately 11:45 a.m. on May 4, 2022, while conducting surveillance, Sergeant Schroeder observed a black Chevy Malibu pull into the Winner's Gas Station parking lot and park very close to the front door of the gas station.  Id. at p. 26, lines 1 - 8. After the car stopped in front of the gas station's front door, Sergeant Schroeder observed three people get out of the car.  One of the persons exiting the car was later identified as Defendant Anthony Hitchcock.  Prior to exiting the car, Mr. Hitchcock was seated in the back passenger's seat.  Id. at p. 25, lines 11 - 25.

Sergeant Schroeder estimated that the distance between the Winner's Gas Station front door and his observation location was approximately 100 feet.  Id. at p. 38, lines 6 - 25, and p. 39, lines 1 - 2.  It was later established by the testimony of the defense

investigator, William O'Keefe, who actually paced off the distance, that the distance between the front of the Winner's Gas Station and the front of the building used for the surveillance is approximately 53 yards (159 feet). Id. at p. 63, lines 21 - 25, and p. 64, lines 1 - 6. The sergeant estimated that the Merwin Liquors store was approximately three (3) times as far a distance away from his location as the Winner's Gas Station, or approximately 159 yards (477 feet). Id. at p. 59, lines 4 - 12.

While conducting surveillance, Sergeant Schroeder testified that he noticed as Mr. Hitchcock walked around the parking lot, "[H]e was holding his left jacket pocket" in the exterior of the jacket. Id. at p. 27, lines 6 - 18. In response to an inquiry by the Court, Sergeant Schroeder indicated that the left hand was in the breast area of the coat. He demonstrated to the Court by holding his left hand to the left breast area. Id. at p. 27, lines 20 - 25. The hearing testimony indicated when Mr. Hitchcock removed his hand from the area of his left breast the sergeant could "clearly see the imprint of a firearm" in the area of Mr. Hitchcock's left breast. Id. at p. 28, lines 5 - 11. The officer indicated he kept Mr. Hitchcock under surveillance for 3 - 4 minutes. Id. at p. 29, lines 10 - 11. The sergeant went on to say that Mr. Hitchcock did not keep his hand at his breast pocket the entire time, but that while he was walking around he would move it back and forth to his left breast pocket. Id. at p. 29, lines 12 - 17. The sergeant's testimony was that Mr. Hitchcock's action of moving his hand back and forth to the exterior of the jacket at his left breast was further confirmation that Mr. Hitchcock had a gun. The sergeant testified

4

that the act of Mr. Hitchcock placing his hand on his left breast was confirmation that Mr. Hitchcock had a gun and was checking the security of the gun.  Id. at p. 58, lines 2 - 25.

In claiming that he could clearly see the outline of the gun, the sergeant indicated that the handle or the magazine was pointed up [toward the sky] so that the barrel would be pointing across Mr. Hitchcock's belly toward his belly button.  Id. at p. 36.  The sergeant testified he "could tell exactly how it [the gun] was positioned in the pocket [left breast pocket]."  Id. at p. 36, lines 11 - 12.  On cross-examination, Sergeant Schroeder repeatedly confirmed that he could clearly see the outline of the gun and that the gun was positioned in Mr. Hitchcock's coat so that the gun was upside down with the handle and magazine pointed up to the sky and with the barrel of the gun pointed forward, so it would be across Mr. Hitchcock's body.  Id. at pp. 53 - 54.

In response to an inquiry by the Court, Sergeant Schroeder indicated that the butt of the gun where the magazine would be would be facing up toward the sky or toward Mr. Hitchcock's breast or upper left shoulder.  The barrel of the gun, where the projectile would go out was across Mr. Hitchcock's body toward the right side of his chest.  Id. at p. 53, lines 20 - 25.

In repeated questioning during cross-examination, Sergeant Schroeder confirmed and reconfirmed that using Mr. Hitchcock's body as orientation the magazine handle of the gun was up and down parallel to the height of Mr. Hitchcock's body and the barrel of the gun was perpendicular to his body with the barrel pointing forward.  Id. at p. 53, lines

1 - 15, and p. 54, lines 7 - 19.  On cross-examination, the sergeant also reconfirmed, in response to questioning from defense counsel as well as from the Court, that Mr. Hitchcock was walking around with his left hand to his left breast.  Id. at p. 54, lines 21 - 25; p. 53, lines 16 - 25; p. 27, lines 20 - 24; p. 108, lines 20 - 25; and p. 109, lines 1 - 3.

While observing Mr. Hitchcock walk around the Winner's Gas Station parking lot with his left hand at his left breast, Sergeant Schroeder also observed what he believed was a sale of marijuana between Mr. Hitchcock and occupants of a second vehicle that had arrived on the scene.  Id. at p. 33.  The sergeant testified that it appeared Mr. Hitchcock talked to some people in the second vehicle and then went back over to the vehicle in which he had arrived.  The sergeant testified that Mr. Hitchcock then made a cup motion with his hands and had some marijuana in his hands when we went over to the other car and gave it to the driver of that car.  Id. at p. 33, lines 18 - 25.  The sergeant claimed he could identify the object that was being transferred and that it was marijuana. Id. at p. 34.  He did not see any other exchanges.  Id. at p. 34, lines 19 - 20.  In other words, the sergeant did not observe any exchange of money.  In essence, the testimony does not establish the elements of what is typically described as a "hand-to-hand transaction" involving a sale of marijuana because nothing was observed to have been exchanged (e.g., no currency exchanged so no sale was observed).

On cross-examination Sergeant Schroeder indicated he was not sure that what Mr. Hitchcock had in his hand was marijuana, only that it was a green leafy substance.  Id. at

p. 44, lines 12 - 17.  The officer admitted that they never stopped the people in the second vehicle, so the police were unable to confirm that a marijuana transaction had occurred. Id. at p. 44, lines 15 - 22.

After observing Mr. Hitchcock in the parking lot at the Winner's Gas Station, Sergeant Schroeder noticed that the three occupants of the blue Chevy Malibu got back in the car and started to leave.  Id. at p. 35, lines 21 - 25.  The vehicle drove through the parking lot, onto Broadway, across Lyndale, and into the Merwin Liquors' parking lot, where it stopped and Mr. Hitchcock got out of the car.  Id. at p. 35, lines 1 - 13.  At this juncture, Sergeant Schroeder radioed uniformed police officers to go in to Merwin Liquors and arrest Mr. Hitchcock.

On direct examination, Sergeant Schroeder claimed that he believed he had observed Mr. Hitchcock engaging in a narcotics deal so that Mr. Hitchcock was going to be placed under arrest for that, but also to discern whether Mr. Hitchcock had a permit for the firearm that the sergeant claimed he could so clearly see in Mr. Hitchcock's jacket pocket.  Id. at p. 53, lines 16 - 19.

On cross-examination, however, Sergeant Schroeder acknowledged that no information was conveyed to the uniformed arresting officers regarding any observation of a hand-to-hand transaction or a narcotics transaction.  Id. at p. 44, lines 23 - 25, p. 45, line 1.

7

All that was conveyed to the responding officers who eventually arrested Mr. Hitchcock was that there was a man with a gun. The Sergeant Schroeder confirmed that the arresting officers had no information regarding a handoff of the green leafy substance. Id. at p. 45, lines 5 - 9. The sergeant confirmed that the only information the arresting officers had regarding probable cause or reasonable suspicion was his report of a man with a gun.

> Q. Yeah. But what you provided them with in regards to probable cause or reasonable suspicion was man with a gun?
>
> A. Exactly right.

Id. at p. 45, lines 10 - 12.

Sergeant Schroeder admitted even if he had observed a transaction involving a small amount of marijuana, that transaction "in the grand scheme of things is not as important as a male with a gun." Id. at p. 46, lines 5 - 12.

The defense called William O'Keefe. Mr. O'Keefe is employed as a private investigator and has worked in private investigations for 41 years. During that time, he has testified dozens of times in federal court in hearings and in trials. In this matter, he was retained by the defense to investigate the circumstances surrounding Mr. Hitchcock's seizure and search on May 4, 2022. Id. at p. 61, lines 4 - 17. Investigator O'Keefe indicated that he had paced off the distance between the front of the Winner's Gas Station building and the front of the building used for surveillance, and that the approximate distance between the buildings was 53 yards. Id. at p. 63, lines 2 - 25, and p. 64, lines 1 -

8

6.  Investigator O'Keefe indicated that he had reviewed various videos from the surveillance from the store surveillance system at the Winner's Gas Station as well as bodycam videos of the surveillance and the seizure, arrest, and search of Mr. Hitchcock. Id. at p. 62; lines 22 - 25; p. 63, lines 1 - 5; and p. 64, lines 16 - 18.

Investigator O'Keefe was shown a jean jacket, which was marked as defense Exhibit D-5 for demonstrative evidence at the October 27, 2022 Motions Hearing. Investigator O'Keefe identified the exhibit as a jacket, which had a distinctive insignia on the back.  Investigator O'Keefe described the insignia on the back of the jacket to be like a child's fluffy toy, maybe a rabbit or a small Dumba the bear, which has one of its eyes as an "x" and the other eye as a button.  There are also the words, "Lucky Charm," and it has a baseball and a heart.  Id. at p. 70, lines 12 - 21.



*See* the Declaration of George Dunn in Support of Defendant Anthony Lee Hitchcock's Motion to Suppress Search and Seizure (hereinafter "Dunn Declaration"), Exhibit A and ¶ 5.

Investigator O'Keefe testified that it appeared the jacket identified as Exhibit D-5 for demonstration at the October 27, 2022 Motions Hearing and the jacket that Mr. Hitchcock was wearing in the videos appeared to be the same jacket.  Motions Hearing Transcript, p. 65, lines 20 - 25; p. 66, lines 1 - 4; p. 83, lines 9 - 16.  The Government, however, would not stipulate that the jacket in court was the same jacket Mr. Hitchcock was wearing at the time of his arrest.  The Government did indicate that sufficient foundation had been laid so that the defense could argue it was the same jacket.  Id. at p. 73, lines 6 - 16.

With the Court watching, Investigator O'Keefe measured the pocket on the outside left breast of the jacket.  That pocket measures approximately 5 1/4" from the inside flap to the bottom of the pocket.  Id. at p. 78, lines 6 - 15.

Investigator O'Keefe said that there was also a wider pocket on the interior lower left side of the jacket.  That pocket measured 6" wide.  Id. at p. 80, lines 4 - 6.

The gun allegedly seized from Mr. Hitchcock in this matter was a Walther PPQ Classic Black 9 mm.  The dimensions of the gun, taken from an internet printout from the manufacturer's site, indicate that the overall length of the gun is 7.1", the height is 5.3", and the width is 1.3".  *See* Exhibit D-1 from the October 27, 2022 Motions hearing.  On

cross-examination, Sergeant Schroeder measured the length of the gun from one end to the other to be just a little over 7" long.  The depth of the gun from the bottom of the handle to the top of the gun was approximately 5 1/3".  The width of the gun was 1 1/3".  Motions Hearing Transcript, p. 51, line 5 - 25.  Investigator O'Keefe testified the gun had an overall length of 7.1", height of 5.3", and width of 1.3".  Id. at p. 76, lines 4 - 6.

Investigator O'Keefe then demonstrated how it was impossible for the gun to be situated in the jean jacket (Exhibit D-5 of the October 27, 2022 Motions Hearing) in the manner that Sergeant Schroeder had testified he had supposedly so clearly seen the outline of the gun on May 4, 2022.  There was no pocket in the left breast area of the jacket in which the gun could have fit.  Additionally, although there is an inside pocket in the interior left side of the jacket, the pocket is not big enough to fit the gun in the manner described by Sergeant Schroeder.  Motions Hearing Transcript, pp. 78 - 80.

In his direct/cross-examination, Sergeant Schroeder confirmed repeatedly that he could clearly see the whole outline of the gun and that the orientation of the gun was in Mr. Hitchcock's left breast pocket with the handle of the gun pointing up to the sky and the barrel of the gun perpendicular to Mr. Hitchcock's body with the barrel pointed forward.  Id. at p. 37, lines 3 - 6; p. 54, lines 7 - 19; and p. 55, lines 1 - 15.  As the Court witnessed during the demonstration by Investigator O'Keefe, the gun could not have been situated so that the barrel was perpendicular to Mr. Hitchcock's body because the gun measures 7.1" and the left breast pocket only measures 5 1/4" and the width of the lower

interior left side pocket is almost exactly 6". <u>Id</u>. at p. 78, lines 6 - 15; p. 79, lines 14 - 25; and p. 80, lines 1 - 18.  Additionally, the gun could not have been positioned as the sergeant described it in the breast pocket of Mr. Hitchcock's coat because that pocket only measures 5 1/4" high. <u>Id</u>. at p. 78, lines 6 - 15.  The evidence shows that there is simply no pocket or holster in the area of Mr. Hitchcock's left breast that could have held a gun.

As way of a demonstration at the October 27, 2022 Motions Hearing, the defense brought a vodka bottle 750 mL (25.4 oz.) filled with water and marked as Exhibit D-6 for identification and demonstration.  <i>See</i> the Dunn Declaration, Exhibit C (hereinafter the "plastic bottle"), pictured below.



The plastic bottle measured at a height of 9", a width of 3 ½", and a thickness of less than 2".  Motions Hearing Transcript, pp. 74 - 75.  The plastic bottle fit into the left inside pocket of the jacket with the top of the bottle sticking up just barely from the top of the pocket.  Id. at p. 77, lines 10 - 22.

Toward the end of the hearing, the defense had Investigator O'Keefe put the jacket on to demonstrate what could be seen when the gun was in the pocket of Exhibit D-6 from the October 27, 2022 Motions Hearing and when the plastic bottle was put in the pocket.  Motions Hearing Transcript, p. 89, lines 1 - 25, and pp. 91 and 93.  Investigator O'Keefe was unable to put the gun in as described by Sergeant Schroeder because the pocket is not wide enough for the barrel of the gun to be at the bottom of the pocket perpendicular to the person's body who is wearing the coat.

Accordingly, Investigator O'Keefe put the gun in the pocket so that the barrel of the gun, where the projectile would come out, was pointing to the ground, the sites of the gun were toward the back of Investigator O'Keefe's body, and the butt/handle of the gun was toward the buttonholes of the jacket with the handle running parallel to the ground. Id. at p. 91, lines 5 - 25.  To further the demonstration, Investigator O'Keefe was asked to walk around the courtroom and the court asked him to come a little closer to the bench. Id. at p. 92, lines 13 - 25.  The Court then made the following observation: "The record should reflect the reason I had Mr. O'Keefe come toward the Court in this demonstration is that I'm observing an outline of something that could be a weapon, could be a gun, and

13

that's why I wanted to bring Mr. O'Keefe closer to see if that impression, as I was seeing, was actually the gun, and it ended up it was the heavy metalled object of the gun." Id. at p. 92, lines 18 - 24.  The Court then agreed that really all that could be seen is one straight line, but the handle could not been seen. Id. at p. 92, lines 24 - 25, and p. 93, lines 1 - 5. It was obvious from the demonstration that it was impossible for Sergeant Schroeder, using binoculars approximately 159 feet away from Mr. Hitchcock, to have "clearly" seen the "entire outline of the gun" at the time in question.

Per defense counsel's instruction, Investigator O'Keefe put the vodka bottle with the water in it in the same pocket. Id. at p. 94, lines 3 - 8.  Investigator O'Keefe was then asked to walk around a little bit to demonstrate. Id. at p. 94, lines 17 - 18.  The Court indicated: "I can tell there's an object in that jacket.  It could be a vodka bottle.  It could be a weapon." Id. at p. 94, lines 20 - 21.  The Court went on to note, "Well, I wouldn't know if it was a vodka bottle as such, but some  - - it could be something other than a handgun.  I think that's fair to say." Id. at p. 94, lines 23 - 25.

Finally, Investigator O'Keefe indicated that it did not appear that the jacket being used for the demonstrations (October 27, 2022 Motions Hearing Exhibit D-5), which was worn by Mr. Hitchcock on the date in question, had been altered in any way.  He indicated that the jacket seemed consistent with the way it was manufactured in regard to both the left breast pocket and the interior lower left pocket. Id. at p. 95, lines 5 - 13.

## LAW

The Fourth Amendment of the U.S. Constitution protects a person from unreasonable searches and seizures. The United States Supreme Court held in the seminal case of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that the police could, without a warrant, briefly stop and question a person that the police reasonably suspect participation in criminal activity. Id. 392 U.S. at 20 - 23. For the stop to include a frisk, an officer must have reasonable suspicion that the person properly stopped might be armed and dangerous. United States v. Green, 946 F.3d 433, 439 (8th Cir. 2019). The Terry court stated that the reasonable suspicion must be derived for more than an "inchoate and unparticularized suspicion 'hunch.'" Id. 392 U.S. at 27. To justify a Terry stop-and-frisk, the police must be able to point to "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983); see also Terry 392 U.S. at 20 - 21.

Under Terry, both the stop and the frisk for weapons during the stop must be supported by reasonable suspicion. United States v. Slater, 979 F.3d 626, 629 (8th Cir. 2020). For the stop, the officer must have "reasonable suspicion that 'criminal activity may be afoot.'" Id. 979 F.3d at 629 (citing United States v. Houston, 920 F.3d at 1172 (quoting Terry, 392 U.S. at 30, 88 S.Ct. 1868)). For a frisk, the officer must have reasonable suspicion a person with whom the officer is dealing might be armed and

presently dangerous.  Id.  In evaluating the validity of a Terry stop, the totality of the

circumstances in each case must be analyzed to determine whether the detaining and

frisking officer has a particularized and objective basis for suspecting legal wrongdoing.

United States v. Jones, 606 F.3d 964, 966 (8th Cir. 2010).  Justifying a Terry stop, officers

may not rely on "inarticulate hunches."  Id. 606 F.3d at 966.  In Jones, the 8th Circuit

affirmed the trial court's decision to grant the defense motion to suppress the gun based

on lack of reasonable suspicion to justify a stop-and-frisk.  The court held that seeing

someone walking across a church parking lot wearing a long-sleeved, hooded sweatshirt

and "clutching the front area of his hoodie pocket with his right hand" did not establish

reasonable suspicion to stop-and-frisk the person.  Id. at 964 and 968.  The Jones court

commented that it understood the importance of preventing unlawful possession of

firearms.  In the end, however, the court recognized being stopped and frisked was a

substantial invasion of an individual's right to be free from arbitrary interference by the

police.  Id. at 968.  It also recognized that police officers may not rely on "inarticulate

hunches" to justify a stop.  Id. at 966 (citing Terry at 22).

Under Terry and its progeny, reasonable suspicion justifying a stop and/or frisk

cannot be supported by circumstances and observations that describe a very large

category of presumably innocent travelers.  Reed v. Georgia, 448 U.S. 438, 441 (1980).

"Obviously, conduct typical of a broad category of innocent people provides a

weak basis for suspicion."  U.S. v. Crawford, 891 F.2d 680, 681 (8th Cir. 1989) (*citing*

<u>Reed v. Georgia</u>, 448 U.S. at 441).  Accordingly, there is no reasonable suspicion when defendant's conduct was typical of countless innocent people.  <u>Id</u>. 891 F.2d at 682 - 683.

**L<small>EGAL</small> A<small>RGUMENT</small>**

**I.  <u>The observations of Sergeant Schroeder on May 4, 2022 do not support the reasonable suspicion necessary to stop-and-frisk the defendant</u>**.

In this case, the testimony and evidence has established that the observations made by Sergeant Schroeder on May 4, 2022 did not justify the stop-and-frisk of Mr. Hitchcock.  The sergeant's testimony that during surveillance he could clearly observe the entire outline of a gun in Mr. Hitchcock's left breast pocket is incredible.  Also incredible is a claim that an outline of a gun could be seen anywhere through Mr. Hitchcock's jacket at the time in question.  Furthermore, the supposed observation of a handoff of a green leafy substance does not establish the reasonable suspicion necessary to stop-and-frisk the defendant.  Finally, the stop of defendant on May 4, 2022, in the Merwin Liquors was, in reality, was a detention, seizure, and arrest of the defendant that required probable cause, which is not supported by the evidence in the case.

**A.  The supposed observation of an outline of a gun in the jacket is incredible and does not support reasonable suspicion needed to stop-and-frisk the defendant.**

At the hearing held on October 27, 2022, before Magistrate Judge Tony N. Leung, the defense conducted a series of demonstrations for the Court.  These demonstrations utilized the actual jacket worn by Mr. Hitchcock on May 4, 2022 (October 27, 2022

17

Motions Hearing Exhibit D-5), as well as the gun purportedly involved in the case.

The first set of demonstrations were while the defense investigator witness was seated in the witness box.  Those demonstrations involved measuring the left breast pocket of the jacket and the interior lower left pocket of the jacket as well as measuring the gun.  The measurements showed that the gun could not have fit in the left breast pocket.  The measurements also showed that the gun could not have fit in the interior lower left pocket of the jacket in the manner described by Sergeant Schroeder.  The witness then demonstrated with the gun how it could not fit in either of the pockets in the manner Sergeant Schroeder had testified he had "clear[ly]" seen the "entire outline of the gun."  Motions Hearing Transcript, pp. 78 - 80; *see also* "I could clearly see the imprint of a firearm."  Id. at p. 28, line 11; "I could see the whole outline of it [the gun]."  Id. at p. 37, line 6; "I could tell exactly how it [the gun] was positioned in the pocket.  It was pointing so the handle or the magazine was up, so the barrel would have been pointing, I guess, across his body . . .."  Id. at p. 36, lines 11 - 14.

The second set of demonstrations involved having the investigator witness, who has a similar body type as Mr. Hitchcock, try on the jacket and place the gun in the interior lower left pocket.  The gun was placed in the interior lower left pocket so that the barrel was pointed down toward the floor, the handle was perpendicular with the floor with the butt of the handle pointed toward the buttonholes of the jacket and the sites of the gun facing toward the back of the witness.  Id. at p. 91, lines 12 - 24. Investigator

O'Keefe was then asked to walk around the courtroom with the jacket on and the gun in the interior lower left pocket of the jacket.  Once the gun was in the jacket in the interior lower left pocket, all that could be seen was a straight line crease running roughly parallel with the buttons.  No handle to the gun was visible.  *See* Motions Hearing Transcript, pp. 92 - 93.  In fact, in observing Investigator O'Keefe with the jacket on and the gun in the interior lower left pocket, the Court commented, "I wouldn't conclude that it was a handle, but it could well be a firearm there."  Id. at p. 93, lines 2 - 3.

The third set of demonstrations involved placing a vodka bottle filled with water in the interior lower left pocket of the jacket.  The plastic bottle measured as a height of 9", a width of 3 ½", and thickness of 2".  Id. at pp. 74 - 75.  Again, Investigator O'Keefe was asked to walk around the courtroom.  Id. at p. 94.  After observing Investigator O'Keefe wearing the jacket with the vodka bottle in the left inside pocket, the Court commented, "I can tell there's an object in that jacket.  It could be a vodka bottle.  It could be a weapon."  Id. at p. 94, lines 20 - 21.  The Court went on to comment, "Well, I wouldn't know if it was a vodka bottle as such, but some - - it could be something other than a handgun.  I think that's fair to say."  Id. at p. 94, lines 23 - 25.

After the courtroom demonstration during which the actual gun in this case was placed in the inside pocket of Mr. Hitchcock's jacket, counsel realized a paperback book might be a better demonstrative aid to show the lack of reasonable suspicion for a stop-and-frisk in this case.  Accordingly, defense counsel did a demonstration in his office

involving a paperback book which measured a height of 7 ½", a width of 4 ½", and a thickness of 1 ½". *See* Dunn Declaration, Exhibit B. The measurements of the book compare favorably to the gun, which measured a height of 7.1", a width of 5.3", and a thickness of 1.3".

Counsel then had the investigator place the book into the interior lower left pocket of the jacket and took photographs which are attached as Exhibit A in the Dunn Declaration. As the Court can see from the photographs, the hard line created by the edge of the book closely resembles the hard line that was created by the edge of the gun in the jeans jacket pocket. These demonstrative photographs are intended to supplement the record in regard to the inability of the testifying officer to have actually been able to "clearly see the imprint of a firearm" so that he could "see the whole outline of it [the gun]" during the surveillance he was conducting on May 4, 2022. Motions Hearing Transcript, p. 28, lines 10 - 11, and p. 37, lines 3 - 6.

The courtroom demonstrations during the October 27, 2022 Motions Hearing also conclusively showed that the handgun could not have been in the breast pocket of the jacket, nor on the inside of the jacket in the left breast area.

During the hearing, Sergeant Schroeder repeatedly indicated that he observed the outline of a gun in the upper left breast pocket of the jacket Mr. Hitchcock was wearing. Sergeant Schroeder also testified that he observed Mr. Hitchcock constantly check the upper left breast pocket of his jacket by using his left hand against his left breast. *See*

Motions Hearing Transcript, p. 27, p. 54, lines 21 - 25, p. 56, line 25; and p. 57, lines 1 -

4.  At one point, the Court even questioned the sergeant's demonstration.

> THE COURT:  So your demonstrating holding a left hand up
> to your left breast area; is that correct?
>
> THE WITNESS: Yes, sir.

Id. at p. 27, lines 22 - 24.

As shown by the courtroom demonstrations with the jacket and the gun, there is no

inside pocket located in the left breast area of the jacket worn by the defendant at the time

in question.  Additionally, there is no way a gun could be positioned in the left breast area

of the jacket or the defendant's person.  The left breast pocket is just too small to fit the

gun.  Accordingly, testimony regarding "clearly" seeing the "whole outline" of a gun in

the left breast area of the jacket Mr. Hitchcock was wearing on the date in question is

incredible and cannot be the factual basis to support reasonable suspicion to justify the

stop-and-frisk of Mr. Hitchcock.

The bottom line is that the courtroom demonstration as well as the photographs

produced in the Dunn Declaration show conclusively that the testimony of Sergeant

Schroeder that he could clearly see the whole outline of the gun in the inner left breast

pocket of Mr. Hitchcock on the day in question is incredible.  It is also incredible that the

sergeant could have observed the whole outline of a gun anywhere on Mr. Hitchcock's

person on the date and time in question.

Because an observation of the whole outline of a gun is incredible, the supposed observation is not sufficient to support reasonable suspicion to effectuate a stop-and-frisk of Mr. Hitchcock.  The testimony demonstrates that Mr. Hitchcock's observed conduct of having something in the pocket of his jacket and placing his hand to his left breast is typical of the actions of countless innocent people.  As such, the conduct does not support reasonable suspicion to stop-and-frisk the defendant.  Crawford, 891 F.2d 680, 681 (8th Cir. 1989).

**B.  Supposed observation of a hand-off of a green leafy substance does not support reasonable suspicion to stop-and-frisk the defendant.**

At the hearing in this matter, Sergeant Schroeder indicated that while observing Mr. Hitchcock at the Winner's Gas Station on May 4, 2022, he observed Mr. Hitchcock give a green leafy substance to another person.  The sergeant claimed that the handoff was between Mr. Hitchcock and an unidentified individual in another vehicle who had arrived in front of the Winner's Gas Station.  *See* Motions Hearing Transcript, p. 33, lines 14 - 25, and p. 44, lines 12 - 20.  The sergeant testified, "Mr. Hitchcock appeared to talk to them [people in the other vehicle].  Then he went back over to his vehicle.  He made like a cup motion with his hands and then had some marijuana in his hands, went over to this other car and gave it to the driver of that car."  Id. at p. 33, lines 18 - 22.  The sergeant testified that he could tell it was marijuana because he could "see parts of it from our binoculars and our vantage point."  Id. at p. 34, lines 2 - 3.  The sergeant testified that

22

he did not see any other exchanges.  Id. at p. 34, lines 19 - 20.

On cross-examination, Sergeant Schroeder admitted that they never stopped the other vehicle, the one that had supposedly received the suspected marijuana.  Id. at p. 44, lines 9 - 11.  Accordingly, the substance supposedly observed being given to the other person was never confirmed to be marijuana.  The sergeant further admitted that the green leafy substance he observed being handed off could have been something other than marijuana.  Id. at p. 44, lines 11 - 17.  The sergeant testified that it could have been mint, basil, or lettuce "if that's what they're selling and passing off in the gas station."  Id. at p. 44, lines 12 - 20.  Accordingly, Sergeant Schroeder's testimony regarding it being marijuana is grounded in the concept that something being sold at the gas station must be marijuana.  Importantly, however, there is no testimony to suggest that the sergeant saw an exchange of currency or money for the supposed marijuana.  In fact, on direct examination, after talking about the delivery of marijuana, the sergeant was asked the question, "Could you see any other exchanges?," and he responded, "I couldn't, or at least I don't recall any."  Id. at p. 34, lines 19 - 20.  The testimony is that there was nothing exchanged in return for the green leafy material.  There was no sale.  There was no hand-to-hand transaction.

Accordingly, all that the officer observed of this situation was Mr. Hitchcock with cupped hands supposedly delivering a green, leafy substance to a person in another car, but no exchange of currency, and the other car was not stopped so there is no

23

confirmation that the material supposedly handed off was actually marijuana. Additionally, Sergeant Schroeder's credibility regarding what he actually did and did not observe in this matter is questionable:  (1) if Sergeant Schroeder was serious about prosecuting the case for the sale of marijuana, it would have been necessary to stop the other vehicle, seize the substance in question, and have it tested; (2) it has been established that Sergeant Schroeder was approximately 159 feet away from the supposed action that he was observing and although he had binoculars, there is a limit to what even binoculars can see at 159 feet (over half a football field away from the observation point); and (3) Sergeant Schroeder's testimony regarding "clearly" seeing the outline of a gun in Mr. Hitchcock's interior jacket pocket, when he obviously could not see the outline of a gun, demonstrates a willingness to exaggerate what he was actually able to see through the binoculars.

The reality is that in Minnesota hemp can now be legally sold over the counter at any number of retail outlets.  The legal hemp is used for recreational and/or medicinal purposes for the CBD and other properties contained in the hemp.  The flowers of hemp, sometimes also sold as CBD, Delta 8, and Delta 9, are essentially indistinguishable from marijuana even at a close proximity.  It would have been virtually impossible for Officer Schroeder to have been able to determine that the green leafy substance he claims to have seen handed off was illegal marijuana as opposed to legal hemp.

Below is a picture of legal hemp purchased by defense counsel on November 26, 2022, at a legal business called Hemp House, located at 719 West 26th Street, Minneapolis, Minnesota 55405.  Also included is a sales receipt and business card for the store.  While at the store, defense counsel observed numerous hemp flower products that were for sale.  The hemp flower products, even under close observation, were indistinguishable from marijuana.  *See* the Dunn Declaration, ¶ 7.



*See* the Dunn Declaration, Exhibits D, E, and F and ¶ 7.



*See* the Dunn Declaration, Exhibit F and ¶ 7.  The above image denotes a screen shot of another example of a hemp flower product that is totally legal to purchase, possess, use, or hand off to someone else in Minnesota.

Under Minnesota law, the sale, possession, and use of hemp products has been legal since 2018.  It is time for law enforcement personnel and the courts to recognize that seeing someone in possession of a green leafy substance is no longer reasonable suspicion that criminal activity is afoot.  Because the flowers of hemp are indistinguishable from the flowers of marijuana, simply seeing someone hand off a green leafy substance is no longer indicative of criminal behavior.

History teaches us that the law needs to evolve with the changes in society and the changes in the particular laws.  At one point, possession of alcoholic beverages was illegal in this state and country.  During the time of Prohibition, observing a person handing off a whiskey bottle to someone else would have been reasonable suspicion that the person was engaging in criminal activity.  Once Prohibition was repealed and the sale, possession, use, and transfer of alcohol was made legal, that same observation of a person handing off a whiskey bottle to someone else was no longer reasonable suspicion of criminal activity.  As they say, the times they are a-changing.  In Minnesota, merely possessing hemp or giving someone a hemp flower is not illegal and is no longer reasonable suspicion of criminal activity.  Accordingly, seeing someone hand off a green leafy substance does not create the reasonable suspicion that is required to support a stop-and-frisk.  Again, the conduct is typical of countless innocent people and does not create reasonable suspicion.  Crawford, 891 F.2d at 681.

**II.  The stop of the defendant was, in reality, a seizure, detention, and arrest of the defendant that required probable cause, which was not supported by the evidence in the case.**

The arrest of Mr. Hitchcock on May 4, 2022 in the Merwin Liquors on the corner of Broadway and Lyndale was not an investigatory stop-and-frisk, it was an immediate detention, seizure, and arrest.  As such, the detention, seizure, and arrest required the existence of probable cause at the time of the arrest.  As exhibited by the bodycam video from the two arresting officers in the case (October 27, 2022 Motions Hearing, Exhibit D-7, bodycam video entitled, "Person with gun," and Exhibit D-8, bodycam video entitled, "Per gun"), the officers received information while in their car that there was a man wearing a jean jacket with a gun at Merwin Liquors.  They proceeded to Merwin Liquors and arrived at approximately 11:54 a.m., as reflected on the bodycam video.  Both officers entered the store just before 11:55 a.m. and immediately approached the defendant.  As they approached, the officers told Mr. Hitchcock he was being detained and immediately handcuffed him.  The detention, seizure, and arrest were so immediate that the police action required probable cause, not reasonable suspicion.  As argued above regarding reasonable suspicion, probable cause to detain, seize, and arrest Mr. Hitchcock was not established.  Therefore, the detention, seizure, and arrest were illegal.

#### CONCLUSION

Sergeant Schroeder's testimony regarding his supposed ability to see the whole outline of a gun and that he could tell exactly how it was positioned from at least 159 feet away through binoculars is not credible.  As demonstrated in the courtroom, what limited outline of the gun can be seen in the jacket could easily be any number of perfectly legal items, including the plastic bottle that was demonstrated in court or a paperback book. The sergeant's guess that it was a gun and not something perfectly legal was a lucky hunch and nothing more.  A lucky hunch does not provide the required reasonable suspicion to effectuate a stop and search or the probable cause for the detention, seizure, and arrest of Mr. Hitchcock.

The supposed observation of a handoff of a green leafy substance from one individual with no exchange of money does not create a reasonable suspicion that criminal activity is afoot.  Because hemp is now legal in this state, handing off a green leafy substance no longer supports a finding of reasonable suspicion of criminal activity and, therefore, cannot support a stop-and-frisk.

On May 4, 2022, when the officers approached Mr. Hitchcock, they did not conduct a stop-and-frisk, but rather a detention, seizure, and arrest.  The detention, seizure, and arrest must be supported by probable cause.  Just as reasonable suspicion was not supported by the observations of the sergeant who testified, probable cause is also not supported.

29

Respectfully submitted,

TILTON DUNN GROSS P.L.L.P.


Dated:  November 30, 2022          s/ George R. Dunn
                                   George R. Dunn (#188165)
                                   Attorneys for Defendant Anthony Lee Hitchcock
                                   2220 US Bank Center
                                   101 East Fifth Street
                                   Saint Paul, Minnesota 55101
                                   Telephone:  (651) 224-7687
                                   Facsimile:  (651) 224-0239
                                   Email: george@tiltonanddunn.com